IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

RASHID ROY,                                )
                                           )
            Petitioner,                    )
                                           )
      v.                                   )   C.A. No. 16-476 (MN)
                                           )
DANA METZGER, Warden, and                  )
ATTORNEY GENERAL OF THE STATE              )
OF DELAWARE, Respondents.[1]               )

## MEMORANDUM OPINION[2]

Rashid Petitioner. *Pro se* Petitioner.

Andrew J. Vella, Deputy Attorney General, Delaware Department of Justice, Wilmington, Delaware. Counsel for respondents.

March 6, 2019
Wilmington, Delaware

---

[1] Warden Dana Metzger has replaced former Warden David Pierce, an original party to this case. *See* Fed. R. Civ. P. 25(d).

[2] This case was re-assigned from the Honorable Gregory M. Sleet's docket to the undersigned's docket on September 20, 2018.

NOREIKA, U.S. DISTRICT JUDGE

Pending before the Court is a Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 ("Petition") filed by Petitioner Rashid Roy ("Petitioner"). (D.I. 2, 8). The State filed an Answer in opposition. (D.I. 12). For the reasons discussed, the Court will deny the Petition.

I.  **BACKGROUND**

The facts leading to Petitioner's arrest and conviction are set forth below, as summarized by the Delaware Supreme Court in Petitioner's direct appeal:

> On February 17, 2010, at about 5:00 a.m., Alvin Pauls ("Pauls") was getting dressed inside his apartment at the Compton Apartments complex when he heard a scream. Approximately ten minutes later, Pauls left his apartment and went onto Seventh Street in Wilmington.
>
> Pauls heard a male voice call out to him, "who are you?" from across the street. As Pauls turned to the direction of the sound, he saw a man standing over a second person who was lying in the street. Pauls went to his automobile and called 911. Pauls told the 911 operator that he believed he heard a woman screaming and had seen a man standing over a body in the street.
>
> At 5:17 a.m., a dispatch went out directing City of Wilmington police officers to respond to an assault in progress at the intersection of Seventh and Walnut Streets. Wilmington Police Lieutenant Matthew Kurten ("Lt. Kurten"), in full uniform but driving a discreetly marked Ford Crown Victoria, was the first officer to reach the scene. Lt. Kurten saw only one person on the darkened street— a male later identified to be [Petitioner]—wearing a camouflage coat and walking on the sidewalk near St. Michael's Day Care. At approximately 5:19 a.m., Lt. Kurten radioed the police dispatch center about [Petitioner] and pulled his car up next to him. [Petitioner] abruptly put his hand up against his face, obscuring the officer's view, and began walking in the opposite direction.
>
> As Lt. Kurten began to back his car up to follow [Petitioner], he saw two fully-marked patrol cars pull onto the block from the direction where [Petitioner] was walking. The first of those marked vehicles was driven by Officer Patrick Bartolo ("Officer Bartolo"). Officer Bartolo, who had heard Lt. Kurten's earlier radio transmission,

1

> exited his car, walked toward [Petitioner], and asked [Petitioner] to approach his cruiser. When [Petitioner] hesitated, Officer Bartolo placed his hand on [Petitioner] and guided him toward the police car.
>
> As Officer Bartolo and [Petitioner] were approaching the police vehicle, Wilmington Police Officers Timothy O'Connor and Jamaine Crawford arrived and placed [Petitioner] in handcuffs. Officer Crawford asked [Petitioner] if he had any weapons in his possession. [Petitioner] responded that he had a knife. Officer O'Connor then took a hat from [Petitioner]'s hand and discovered a knife inside the hat. After Officer O'Connor removed his hands from [Petitioner]'s clothing, he noticed that they were slippery.
>
> When Officer O'Connor shined a flashlight on his own hands, he noticed that his hands were covered in blood. The light revealed that [Petitioner]'s hands were also bloody. At the same time this was happening, another officer radioed that she had found an unconscious black male—the victim, Davelle Neal. [Petitioner] was then placed in Officer Bartolo's patrol car and transported to the police station.
>
> In later statements made to the police, [Petitioner] maintained that he and Neal had been robbed by unknown individuals who fled in an unknown car in an unknown direction. [Petitioner] claims to have wrestled the knife away from the assailants, wrapped it in a scarf, and put it in his hat. [Petitioner] also told the police that he dragged Neal out of the street to help him.
>
> The clothing that [Petitioner] was wearing on the night of the incident was subjected to forensic analysis. Testing revealed that the blood on [Petitioner]'s clothes and on the knife was consistent with the blood of Neal. At trial, a blood spatter analyst opined that the stains found on [Petitioner]'s clothing and in the vicinity of Neal's body were inconsistent with [Petitioner]'s statements and were more consistent with [Petitioner] and Neal engaging in a struggle. The police later obtained a video of the crime from motion-activated cameras. Based on the clothing he was wearing that night, [Petitioner] was identified in the video as the one who killed Neal.

*Roy v. State*, 62 A.3d 1183, 1185–86 (Del. 2012).

In May, 2010, Petitioner was indicted and charged with first degree murder, possession of a deadly weapon during the commission of a felony ("PFDCF"), possession of a deadly weapon by a person prohibited ("PDWBPP"), third degree assault, and terroristic threatening. *Id*. at 1186.

2

In April 2011, a Delaware Superior Court jury found Petitioner guilty of first degree murder, PDWDCF, third degree assault, and terroristic threatening; the State entered a *nolle prosequi* on the severed charge of PDWBPP. *Id*. The Superior Court sentenced Petitioner to life imprisonment on the murder conviction, and on the remaining convictions, to an aggregate of twelve years at Level V incarceration, suspended after eleven years for decreasing levels of supervision. *See State v. Roy*, 2016 WL 1621589, at *1 (Del. Super. Ct. Apr. 21, 2016). The Delaware Supreme Court affirmed Petitioner's convictions and sentences. *See Roy*, 62 A.3d at 1192.

In July 2013, at Petitioner's request, the Superior Court appointed counsel to represent Petitioner in a Rule 61 proceeding. (D.I. 12 at 4). In November 2014, post-conviction counsel filed in the Delaware Superior Court a motion for post-conviction relief pursuant to Delaware Superior Court Criminal Rule 61 ("Rule 61 motion"). *See State v. Roy*, 2015 WL 5000990, at *1 (Del. Super. Ct. July 31, 2015). The Superior Court denied the Rule 61 motion in July 2015. *See id*. Petitioner appealed that decision, but voluntarily dismissed his appeal on November 30, 2015. (D.I. 12 at 4; D.I. 15-6 at 2).

In February 2016, Petitioner filed a second Rule 61 motion. *See Roy*, 2016 WL 1621589, at *1. The Superior Court summarily dismissed the second Rule 61 motion as procedurally barred in April 2016. *Id*. at *5. Petitioner did not appeal that decision.

## II.   GOVERNING LEGAL PRINCIPLES

### A.   The Antiterrorism and Effective Death Penalty Act of 1996

Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "to reduce delays in the execution of state and federal criminal sentences . . . and to further the principles of comity, finality, and federalism." *Woodford v. Garceau*, 538 U.S. 202, 206 (2003). Pursuant to AEDPA, a federal court may consider a habeas petition filed by a state prisoner only "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United

3

States." 28 U.S.C. § 2254(a). AEDPA imposes procedural requirements and standards for analyzing the merits of a habeas petition in order to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

### B. Exhaustion and Procedural Default

Absent exceptional circumstances, a federal court cannot grant habeas relief unless the petitioner has exhausted all means of available relief under state law. *See* 28 U.S.C. § 2254(b); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842-44 (1999); *Picard v. Connor*, 404 U.S. 270, 275 (1971). The AEDPA states, in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that –
>
> (A) the applicant has exhausted the remedies available in the courts of the State; or
>
> (B)(i) there is an absence of available State corrective process; or
> (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1).

The exhaustion requirement is based on principles of comity, requiring a petitioner to give "state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan*, 526 U.S. at 844-45; *Werts v. Vaughn*, 228 F.3d 178, 192 (3d Cir. 2000). A petitioner satisfies the exhaustion requirement by demonstrating that the habeas claims were "fairly presented" to the state's highest court, either on direct appeal or in a post-conviction proceeding, in a procedural manner permitting the court to consider the claims on their merits. *See Bell v. Cone*, 543 U.S. 447, 451 n.3 (2005); *Castille v. Peoples,* 489 U.S. 346, 351 (1989).

4

A petitioner's failure to exhaust state remedies will be excused, and the claims treated as "technically exhausted," if state procedural rules preclude him from seeking further relief in state courts. *See Coleman v. Thompson*, 501 U.S. 722, 732, 750-51 (1991) (such claims "meet[] the technical requirements for exhaustion" because state remedies are no longer available); *see also Woodford v. Ngo*, 548 U.S. 81, 92-93 (2006). Although treated as technically exhausted, such claims are procedurally defaulted for federal habeas purposes. *See Coleman*, 501 U.S. at 749 (1991); *Lines v. Larkins*, 208 F.3d 153, 160 (3d Cir. 2000). Federal courts may not consider the merits of procedurally defaulted claims unless the petitioner demonstrates either cause for the procedural default and actual prejudice resulting therefrom, or that a fundamental miscarriage of justice will result if the court does not review the claims. *See McCandless v. Vaughn,* 172 F.3d 255, 260 (3d Cir. 1999); *Coleman,* 501 U.S. at 750-51. To demonstrate cause for a procedural default, a petitioner must show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). To demonstrate actual prejudice, a petitioner must show that the errors during his trial created more than a possibility of prejudice; he must show that the errors worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* at 494.

Alternatively, if a petitioner demonstrates that a "constitutional violation has probably resulted in the conviction of one who is actually innocent,"[3] then a federal court can excuse the procedural default and review the claim in order to prevent a fundamental miscarriage of justice. *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Wenger v. Frank*, 266 F.3d 218, 224 (3d Cir. 2001). The miscarriage of justice exception applies only in extraordinary cases, and actual

---

[3] *Murray*, 477 U.S. at 496.

5

innocence means factual innocence, not legal insufficiency. *See Bousley v. United States*, 523 U.S. 614, 623 (1998); *Murray*, 477 U.S. at 496. A petitioner establishes actual innocence by asserting "new reliable evidence - - whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence - - that was not presented at trial," showing that no reasonable juror would have voted to find the petitioner guilty beyond a reasonable doubt. *Hubbard v. Pinchak*, 378 F.3d 333, 339-40 (3d Cir. 2004).

## III.  DISCUSSION

Petitioner's timely filed habeas Petition asserts the following two grounds for relief: (1) post-conviction counsel provided ineffective assistance in his first Rule 61 proceeding by failing to argue that the Delaware Supreme Court "misapprehended" the facts of the 911 call and also by failing to allege that appellate counsel provided ineffective assistance on direct appeal; and (2) post-conviction counsel provided ineffective assistance in his first Rule 61 proceeding by failing to raise a claim alleging that trial counsel provided ineffective assistance by not consulting with Petitioner and advising Petitioner of his right to testify during the suppression hearings.

To the extent Petitioner asserts two freestanding claims of ineffective assistance of post-conviction counsel, his arguments fail to warrant relief. The claims are not cognizable on federal habeas review, because there is no constitutional right to counsel in initial review collateral proceedings. *See* 28 U.S.C. §2254(i) ("The effectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254."); *see also Coleman*, 501 U.S. at 752 ("There is no constitutional right to an attorney in state post-conviction proceedings.").

Nevertheless, the Court exercises prudence and liberally construes the two claims as alleging ineffective assistance on the part of trial/appellate counsel. Even this liberal construction, however, does not aid Petitioner in his quest for habeas relief. The record reveals that Petitioner

did not exhaust state remedies for Claims One and Two, because he never presented them to Delaware Supreme Court.[4] At this juncture, any attempt by Petitioner to raise Claims One and Two in a new Rule 61 motion would be barred as untimely under Delaware Superior Court Criminal Rule 61(i)(1). *See* Del. Super. Ct. Crim. R. 61(i)(1) (establishing a one-year deadline for filing Rule 61 motions). Consequently, the Court must treat Claims One and Two as technically exhausted but procedurally defaulted, which means that the Court cannot review the merits of the claims absent a showing of cause and prejudice, or that a miscarriage of justice will result absent such review.

Petitioner appears to assert that post-conviction counsel's failure to raise Claims One and Two in his first Rule 61 motion constitutes cause for his default. In *Martinez v. Ryan,* 566 U.S. 1 (2012), the Supreme Court held for the first time that inadequate assistance of counsel during an initial-review state collateral proceeding may establish cause for a petitioner's procedural default of a claim of ineffective assistance of trial counsel. *Id.* at 16-17. In order for a procedural default to be excused under *Martinez*,[5] however, a petitioner must demonstrate that: (1) the procedural default was caused by either the lack of counsel or post-conviction counsel's ineffective assistance; (2) the lack or ineffectiveness of counsel occurred in the first collateral proceeding in which the claim could have been heard; and (3) the underlying ineffective assistance of trial counsel claim is

---

[4] For instance, Petitioner did not include Claims One and Two in his first Rule 61 motion, and he voluntary withdrew the appeal of his first Rule 61 motion. Additionally, even though Petitioner presented the two claims in his second Rule 61 motion, he did not present them to the Delaware Supreme Court because he did not appeal the Superior Court's summary dismissal of his second Rule 61 motion.

[5] Finding cause under *Martinez* "does not entitle the prisoner to habeas relief. It merely allows a federal court to consider the merits of a claim that otherwise would have been procedurally defaulted." *Martinez*, 566 U.S. at 17.

substantial (*i.e.*, has "some merit"). *See Cox v. Horn*, 757 F.3d 113, 119 (3d Cir. 2014) (quoting *Martinez*, 566 U.S. at 14).

A petitioner demonstrates that post-conviction counsel's ineffectiveness caused the procedural default by showing that post-conviction counsel's performance was deficient under the first prong of the *Strickland v. Washington*, 466 U.S. 668 (1984) standard.[6] *See Preston v. Sup't Graterford, SCI*, 902 F.3d 365, 376 (3d Cir. 2018); *see also Workman*, 2019 WL 545563, at *7. In order to satisfy the first prong of *Strickland,* a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness," with reasonableness being judged under professional norms prevailing at the time counsel rendered assistance. *Strickland*, 466 U.S. at 688. In turn, a petitioner demonstrates the underlying ineffective assistance of trial counsel claim has "some" merit by "show[ing] that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Workman*, 2019 WL 545563, at *4; *see also Martinez*, 566 U.S. at 13-14.

---

[6] Typically, a petitioner demonstrates that counsel provided ineffective assistance by satisfying both prongs of the *Strickland* standard. *See Wiggins v. Smith*, 539 U.S. 510, 511 (2003). As explained in the text of the Memorandum Opinion, the first *Strickland* prong is satisfied by demonstrating that counsel's performance fell below an objective standard of reasonableness. *See infra* at 9. Under the second *Strickland* prong, a petitioner must demonstrate "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *See Strickland*, 466 U.S. at 694. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Id.* The Third Circuit recently explained, however, that a petitioner does not have to satisfy *Strickland*'s more stringent prejudice standard when showing that post-conviction counsel provided ineffective assistance under the *Martinez*/procedural default inquiry. *See Workman v. Sup't Albion SCI*, F.3d, 2019 WL 545563, at *5 (3d Cir. Feb. 12, 2019). Instead, "when a petitioner shows that post-conviction relief counsel's performance was unreasonably deficient, the requirement that the deficient performance result in prejudice may be satisfied with a substantial claim of ineffective assistance of trial counsel that would otherwise have been deemed defaulted." *Workman*, 2019 WL 545563, at *5.

To summarize, if a petitioner "shows that his underlying ineffective-assistance-of-trial-counsel claim has some merit **and** that his state post-conviction counsel's performance fell below an objective standard of reasonableness, he has shown sufficient prejudice from counsel's ineffective assistance that his procedural default must be excused under *Martinez*." *Workman*, 2019 WL 545563, at *7 (emphasis added). For the reasons that follow, the Court concludes that the underlying ineffective assistance of trial/appellate counsel arguments in Claims One and Two cannot provide a basis for excusing Petitioner's procedural default because they do not have "some merit" under the standard contemplated by *Martinez*.

### A. Claim One: Trial/Appellate Counsel Failed to Argue that the Delaware Supreme Court "Misapprehended" the Facts Behind the 911 Call

The record reveals that the 911 caller said a man was standing over a **woman** (D.I. 15 at 11) but, on direct appeal, the Delaware Supreme Court explained that the 911 caller said he "heard a woman screaming and had seen a man standing over a **body**." *Roy*, 62 A.3d at 1185 (emphasis added). In Claim One, Petitioner contends that trial/appellate counsel provided ineffective assistance by failing to file a motion for reargument alleging that the Delaware Supreme Court's "misapprehension" of the facts behind the 911 call resulted in the Delaware Supreme Court erroneously concluding that any evidence obtained during his illegal police detention was admissible because it would have been inevitably discovered through routine and legitimate police conduct (D.I. 1 at 5). According to Petitioner, the Delaware Supreme Court's use of the word "body" instead of the word "woman" reflects that the Delaware Supreme Court misapprehended the facts and that trial/appellate counsel should have argued that this "misapprehension" adversely affected the Delaware Supreme Court's "inevitable discovery" analysis. He contends that the "report of the complaint was based on the location and observation of one male and one female, and gave no information about Petitioner or a second male. The fact that one of the males had

9

been discovered – unconscious and bloody – corroborates with the report of a man assaulting a female, [and] points to no observable and suspicious conduct of Petitioner." (D.I. 17 at 13).

The Court is not persuaded. First, the Delaware Supreme Court was aware that the 911 caller said a man was standing over a woman, because appellate counsel stated this fact in the appellate opening brief and also discussed it at oral argument. (D.I. 8 at 92; D.I. 15 at 11). Second, as demonstrated by the rationale set forth in the following excerpt from the Delaware Supreme Court's decision on direct appeal, the Delaware Supreme Court's use of the word "body" instead of "woman" did not affect its conclusion that the police would have inevitably discovered the evidence obtained from Petitioner during the course of routine proper police conduct.

> The record reflects that the physical evidence obtained from [Petitioner] would have been inevitably discovered in the course of routine, proper police conduct. The police were alerted to a potential assault in progress sometime after 5:00 a.m. Lt. Kurten received a dispatch to Seventh and Walnut Streets in Wilmington at 5:17 a.m. By 5:19 a.m., less than three minutes after being dispatched to that intersection, Lt. Kurten noticed a man—later determined to be [Petitioner]—walking away from the scene. Lt. Kurten responded with a dispatch that alerted the police that a man was near the scene of a suspected crime. After [Petitioner] noticed Lt. Kurten's car, he turned to go in a different direction while covering his face.
>
> As [Petitioner] walked away from Lt. Kurten, he was met by two additional responding police vehicles. This time, [Petitioner] did not make any evasive maneuvers. Nevertheless, Officers Bartolo, Crawford, and O'Connor detained [Petitioner]. First, Officer Bartolo placed his hands on [Petitioner] to escort him near his patrol car, and then Officers Crawford and O'Connor placed [Petitioner] in handcuffs and searched his hat. At the same time this was happening, another police officer reported by radio that the victim's body had been discovered. This all happened within minutes of the first dispatch to police, at 5:17 a.m., to investigate a crime in progress.
>
> The record reflects the Wilmington police officers immediately responded to a report that a violent crime was in progress or had just taken place. [Petitioner] was the only person near the crime scene. The record further reflects that after Lt. Kurten saw [Petitioner], the police did not intend to let [Petitioner] out of their sight. Within only

> a very few minutes after seeing [Petitioner], while [Petitioner] would still have been under police observation as the only male in the area, the victim's body was discovered.
>
> When the victim's body was discovered, the police would have been justified in legally detaining [Petitioner] for investigatory purposes. Due to the violent nature of the crime, the police could have properly performed a pat down search of [Petitioner]'s clothing for weapons. This pat down search would have undoubtedly included [Petitioner]'s hat, which contained the murder weapon. The proper investigatory detention would also have lead to the discovery of the blood on [Petitioner]'s hands and clothing. The results of [Petitioner]'s legal investigatory detention, after the victim's body was discovered, would have led to [Petitioner]'s legal arrest.
>
> In *Cook v. State,* we applied the inevitable discovery rule to facts that are similar to those here. We stated:
>
>> The majority of the cases employing the inevitable discovery exception involve instances in which the illegal police conduct occurred while an investigation was already in progress and resulted in the discovery of evidence that would have eventually been obtained through routine police investigatory procedure. The illegalities in such cases, therefore, had the effect of simply accelerating the discovery. In general, where the prosecution can show that the standard prevailing investigatory procedure of the law enforcement agency involved would have led to the discovery of the questioned evidence, the exception will be applied to prevent its suppression.
>
> Accordingly, we hold that the Superior Court properly denied [Petitioner]'s motion to suppress because the physical evidence discovered during [Petitioner]'s illegal detention would have been inevitably discovered through proper police conduct after the victim's body was discovered.

*Roy,* 62 A.3d at 1190.

An attorney's failure to raise a meritless argument or objection does not amount to ineffective assistance. *See United States v. Sanders*, 165 F.3d 248, 253 (3d Cir. 1999); *see also Glass v. Sec'y Penn. Dep't Corr.*, 726 F. App'x 930, 933 (3d Cir. 2018). Since the distinction between "body" and "woman" made no difference to the Delaware Supreme Court's conclusion

11

that the inevitable discovery doctrine applied to Petitioner's case, trial/appellate counsel's failure to move for reargument on this basis did not amount to constitutionally ineffective assistance. In short, Petitioner's argument regarding trial/appellate counsel's failure to raise the "misapprehension of facts" argument does not have "some" merit and, therefore, cannot provide a basis for excusing his procedural default.

Finally, the miscarriage of justice exception to the procedural default doctrine does not excuse Petitioner's default, because Petitioner has not provided new reliable evidence of his actual innocence. For these reasons, the Court will deny Claim One as procedurally barred from habeas review.

> **B.** **Claim Two: Trial Counsel Failed to Consult with Petitioner about Testifying at Suppression Hearing**

In Claim Two, Petitioner briefly and without elucidation asserts that trial counsel did not consult with him about whether he should testify at the suppression hearing. Petitioner does not articulate what his testimony at the suppression hearing would have been or how the suppression hearing and his trial would have been affected if he had been advised differently and had testified. Petitioner's failure to provide this information renders Claim Two insubstantial for the purposes of the *Martinez* inquiry. In turn, it appears that Petitioner's testimony would not have made any difference as to the admissibility of the seized evidence, because the Delaware Supreme Court actually agreed with Petitioner that his initial detention and subsequent arrest were illegal, and held that the evidence seized during those actions were admissible only because of the inevitable discovery doctrine. *See Roy*, 62 A.3d at 1188-89. Thus, Petitioner's default of Claim Two cannot be excused because Petitioner has failed to demonstrate that Claim Two has "some merit."

The miscarriage of justice exception to the procedural default doctrine also does not excuse Petitioner's default, because Petitioner has not provided new reliable evidence of his actual

innocence. Accordingly, the Court will deny Claim Two as procedurally barred from habeas review.

## IV. PENDING MOTIONS

Petitioner filed the following Motions after the State filed its Answer: (1) Motion to Dismiss Petition Without Prejudice (D.I. 20); (2) Motion to Amend Petition (D.I. 23); (3) Motion to Stay and Abey Habeas Proceeding (D.I. 24); and Motion to Set Aside Motion to Dismiss Petition Without Prejudice (D.I. 26). As discussed above, the Court has concluded that the instant Petition should be denied. Consequently, the Court will dismiss as moot the aforementioned pending Motions.

## V. CERTIFICATE OF APPEALABILITY

When a district court issues a final order denying a § 2254 petition, the court must also decide whether to issue a certificate of appealability. *See* 3d Cir. L.A.R. 22.2 (2011). A certificate of appealability is appropriate when a petitioner makes a "substantial showing of the denial of a constitutional right" by demonstrating "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). If a federal court denies a habeas petition on procedural grounds without reaching the underlying constitutional claims, the court is not required to issue a certificate of appealability unless the petitioner demonstrates that jurists of reason would find it debatable: (1) whether the petition states a valid claim of the denial of a constitutional right; and (2) whether the court was correct in its procedural ruling. *Id.*

The Court has concluded that the instant Petition fails to warrant federal habeas relief, and is persuaded that reasonable jurists would not find this conclusion to be debatable. Therefore, the Court will not issue a certificate of appealability.

## VI. CONCLUSION

For the reasons stated, the instant Petition for habeas relief pursuant to 28 U.S.C. § 2254 is denied without an evidentiary hearing or the issuance of a certificate of appealability. An appropriate Order shall issue.